**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**


DANIEL NOWELL                                                    PLAINTIFF

VS.                                       Civil Action No. 3:09-cv-131 HTW-LRA

ILLINOIS CENTRAL RAILROAD COMPANY D/B/A
CANADIAN NATIONAL/ILLINOIS CENTRAL
RAILROAD                                                         DEFENDANT

<u>**MEMORANDUM OPINION AND ORDER**
**GRANTING SUMMARY JUDGMENT**</u>

Before the court is defendant Illinois Central Railroad Company's motion for

summary judgment, filed pursuant to Fed. R. Civ. P. 56[1] [Docket No. 27].  The key issue

---

[1]  Federal Rule of Civil Procedure 56(a) reads as follows:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

> Rule 56(b) of the Federal Rules of Civil Procedure provides:  Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery.

> Rule 56(c) of the Federal Rules of Civil Procedure provides:
> (1) *Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
> (2) *Objection That a Fact Is Not Supported by Admissible Evidence.*
> A party may object that the material cited to support or dispute a fact cannot be

in this case is whether plaintiff was subjected to retaliation because he engaged in activities protected under Title VII of the Civil Rights Act of 1964 ("Title VII"), Title 42 U.S.C. § 2000e, *et seq.*, or whether defendant terminated plaintiff for a legitimate non-discriminatory reason, i.e., (1) he  reported to work under the influence of alcohol, (2) he brought alcohol onto defendant's premises; and (3) he had a history of work-related infractions.

This court has subject matter jurisdiction over this dispute under federal question jurisdiction pursuant to Title 28 U.S.C. § 1331.[2]  Having heard the arguments of the parties and fully considered the parties' submissions and applicable law, this court grants defendant's motion for summary judgment [Docket No. 27].

## I.  Background

### A.  Procedural History

On December 23, 2008, plaintiff Daniel Nowell ("Nowell") filed a lawsuit in the Circuit Court of Hinds County, Mississippi, First Judicial District, against his employer, Illinois Central Railroad Company ("IC").  He claims he was subjected to retaliation in violation of Title VII and seeks monetary, declaratory, and injunctive relief. Defendant, served with summons and the complaint on February 23, 2009, removed

---

presented in a form that would be admissible in evidence.
(3) *Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
(4) *Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

[2]Title 28 U.S.C. § 1331 provides: "The district courts shall have original jurisdiction of all civil cases arising under the Constitution, laws, or treaties of the United States."

2

that case from state court to this federal court on March 4, 2009, asserting authority to do so under Title 28 U.S.C. §§ 1331, 1441[3] and 1446[4].  Defendant also cites Title 28 U.S.C. § 1332[5] as a basis for removal, contending that the parties have diverse citizenships and that the amount in controversy exceeds $75,000.00, exclusive of costs and fees.

---

[3]Title 28 U.S.C. § 1441 states in pertinent part:
(a)  Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending. For purposes of removal under this chapter, the citizenship of defendants sued under fictitious names shall be disregarded.

(b) Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties. Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.

[4] Title 28 U.S.C. § 1446 states in pertinent part:
(a)  A defendant or defendants desiring to remove any civil action or criminal prosecution from a State court shall file in the district court of the United States for the district and division within which such action is pending a notice of removal signed pursuant to Rule 11 of the Federal Rules of Civil Procedure  and containing a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action.

(b) The notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within thirty days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter.

[5] Title 28 U.S.C. § 1332 states in pertinent part:
(a)  The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between--
(1) citizens of different States;

3

**B.  Relevant Facts**

Plaintiff is a former employee of IC, a subsidiary of Canadian National Railway ("CN").[6]  He began his employment with defendant on September 28, 1998, as a brakeman and was promoted to the position of conductor on September 16, 1999.  CN Personal Work Record of Daniel Nowell.  Plaintiff was terminated and reinstated twice between 2005 and 2007.  *Id.*  His last reinstatement was on September 6, 2007, as a brakeman.  *Id.*  He worked in this position until his third and final termination on January 18, 2008.

Defendant contends that since 2000, despite extensive training, plaintiff has committed a series of serious rule violations, including his involvement in train derailments and other behavior that threatened the health and safety of himself and his coworkers.  Defendant provides the following list of plaintiff's work-related reprimands and rule violations.

On October 3, 2000, defendant recounts that plaintiff received a letter of reprimand for "improperly lining a switch," a violation of IC's operating rules which defendant says, could have sent a train down the wrong track.  Defendant alleges that plaintiff waived investigation and accepted responsibility for the violation.

On January 23, 2004, plaintiff was suspended for 30 days for a December 20, 2003, incident where he mishandled hazardous material by placing torpedoes on the tracks under a locomotive and allowed an engineer to drive over them in apparent

---

[6] IC transports goods by rail through multiple states from Illinois to Louisiana and operates a number of rail yards, including one in Jackson, Mississippi. As a subsidiary of CN, IC applies the operating rules and policy handbooks of CN.

horseplay.  *Id.*  After an investigative hearing, plaintiff was found to have violated various IC's Operating Rules.  *Id.*

On September 22, 2004, plaintiff received a 45-day suspension, which was deferred for six months, for not wearing his safety glasses and sleeping in a locomotive while on duty.  *Id.*  Plaintiff waived his right to a hearing, took responsibility for the violation, and agreed to the discipline assessed.  *Id.*

On April 6, 2005, plaintiff received a 15-day suspension after he ran through a switch while performing switching operations in violation of IC's rules.  *Id.*  Plaintiff again waived his right to a hearing and agreed to the discipline assessed.  *Id.*

On June 22, 2005, IC dismissed plaintiff for violating the company's safety and operating rules when he caused a derailment of and damage to a rail car.  *Id.*  After a complete investigation, IC reinstated plaintiff on August 18, 2005 under a leniency reinstatement.  *Id.*  Plaintiff agreed to the terms of the reinstatement which included a warning that any future incident or unsatisfactory work or conduct could result in discipline, including termination.  *Id.*

On October 16, 2006, IC again dismissed plaintiff for an incident which occurred on June 26, 2006, involving derailment of train cars.  *Id.*  Defendant alleges that plaintiff instructed a railroad engineer to move the train eight to ten car lengths, despite an insufficient amount of track to accommodate such a movement.  The move caused rail cars to run out of track and derail.  Assistant Tom Evans ("Evans") headed an investigation, initiated on October 6, 2006, which led to plaintiff's termination.  The termination letter, signed by Evans, stated that plaintiff's employment was being

5

terminated based on plaintiff's rule violation, his past work record, and the terms of the signed leniency restatement agreement.

Plaintiff alleges that the engineer, the individual driving the train, was not terminated in this matter.  Plaintiff argues he had no control over the situation in which the train cars derailed.  He claims that his termination was in retaliation for his involvement in an Equal Employment Opportunity Commission ("EEOC") investigation and subsequent lawsuit filed by a co-worker, Joseph Conner.  To support this claim, plaintiff cites a comment made by Evans a few days prior to the start of the October 2006, investigation, stating, "I (Evans) am going to get you for what you have done to the railroad."  *See* Nowell depo at 93; First Amended Complaint in Nowell v. Canadian Nat'l R.R., et. al., Civil Case No. 3:07-cv-533.

After plaintiff appealed his termination, the Public Law Board ("PLB")[7] disagreed with the IC investigation and mandated Nowell's reinstatement.  Plaintiff returned to work on September 6, 2007.

Plaintiff's third and final termination, and the basis of this lawsuit, stems from an incident occurring on the night of December 7 and morning of December 8, 2007.  Plaintiff allegedly reported to work under the influence of alcohol.  Plaintiff delivered two positive breath alcohol test results and brought alcohol onto IC's property.  Defendant claims that its decision to test plaintiff and the related process and procedures it utilized were conducted pursuant to federal law and CN/IC policy.

---

[7] A Public Law Board is a tribunal established pursuant to Public Law 89-456 which authorized the establishment of special boards of adjustment on individual railroads.

Plaintiff's version of the story is different.  Plaintiff claims that he was singled out for drug testing, that the testing procedure was flawed, and that he was fired without being offered a waiver and an opportunity to attend an employee assistance program in lieu of termination.  All of these errors and flaws on the part of CN/IC, plaintiff asserts, demonstrate he was fired in retaliation for his past Title VII protected activities.

The predicate facts leading to the dismissal are as follows.  Plaintiff was scheduled to report to work at 2:45 a.m. on December 8, 2007.   During the evening of December 7, 2007, plaintiff called Joan Sabo ("Sabo"), the IC "Crew Caller,"[8] asking to lay off from work because his son was sick.  During that call and a subsequent conversation, both Sabo and Trainmaster Joey Haynes ("Haynes") told Nowell they could not authorize laying off for "personal business."  Haynes advised Nowell to call Assistant Superintendent Joey Bellamy ("Bellamy").   The transcript of the telephone conversation reveals that immediately after Nowell hung up, Sabo commented that Nowell sounded drunk.   Nowell called Bellamy's office, but did not reach him and did not leave a message.

Nowell elected to go to work, but when he arrived, Bellamy, Haynes and CN Special Agent, Mark Moore ("Moore"), were waiting for him in the parking lot to advise him he would be subject to a drug and alcohol test.  Nowell provided two positive alcohol breath tests and a negative urine drug test.  After the alcohol and drug tests, Nowell gave consent to Moore to search his vehicle.  Moore found an unopened bottle of wine in Nowell's glove box.  After the incident, Hallie Burhoe, Senior Manager of IC's

---

[8] Neither party defines the position of "crew caller."  Based on Nowell's statements that he called the crew caller to try to "lay off" from his shift, this court concludes that the crew caller is responsible for coordinating the staffing for the railroad.

Medical Services, dismissed Nowell from duty pending an investigation.

Trainmaster, J.R. Kyzar conducted the subsequent investigation, including two hearings–one on December 18, 2007, and the second on January 11, 2008.  Nowell was represented by the local union chairman, J.J. Russum.  Nowell was terminated on January 18, 2008, for violating CN United States Operating Rules G[9] and H[10], which prohibit use or possession of alcoholic beverages while on duty, and insubordinate conduct and withholding or providing false information, respectively.

Plaintiff's bases his retaliation claim, in part, on his involvement in co-worker Joseph Conner's discrimination complaint and lawsuit.  During plaintiff's employment, co-worker Joseph Conner, filed a charge of discrimination with the EEOC, alleging a

---

[9] CN Railway, U.S. Operating Rules, Third Edition, Effective Sunday, October 30, 2005, Rule G states in pertinent part:

G.      DRUGS AND ALCOHOL.  The use or possession of alcoholic beverages while on duty, on company property, or while occupying facilities paid for or furnished by the company is prohibited.  Employees must not have any measurable alcohol in their breath or in their bodily fluids when reporting for duty, while on duty, or while on company property. . . .

[10] CN Railway, U.S. Operating Rules Third Edition, Effective Sunday, October 30, 2005, Rule H states in pertinent part:

H.      FURNISHING INFORMATION AND CONDUCT.  Dishonesty, disloyalty, insubordination, willful neglect, gross carelessness, desertion from duty, making false reports or statements, concealing facts concerning matters under investigation, immoral conduct, including but not limited to conduct of any employee leading to the conviction of any felony, and serious violations of the law are prohibited.  Employees must not be quarrelsome, vicious or enter into disputes, arguments, or fights with any person, regardless of provocation.  Any incidents are to be reported to the proper authority. . . .
Employees must not withhold information, or fail to provide all the facts to those authorized to receive information regarding accidents, injuries, rule violations, breaches of company security, or unusual events.  This duty to furnish information includes but is not limited to accident and injury reports, recorded statements, full cooperation in injury investigations, and safety rules violations.  Employees must also take all reasonable measures to protect and preserve evidence where it is within their control and ability to do so.

racially hostile work environment.  Plaintiff provided an affidavit to the EEOC in June 2002 in the case involving Conner.  Conner filed a civil lawsuit against IC on December 17, 2002, in the United States District Court for the Southern District of Mississippi (Civil Case No. 3:02-CV-1790-TSL-JCS).  The lawsuit eventually was tried before a jury in February of 2006 and plaintiff testified as a witness.  The jury returned a verdict of $200,000.00 against IC.

Plaintiff filed his own charge of retaliation before the EEOC against IC on November 1, 2006, regarding his October 2006 termination.  He sued IC, among others, on July 24, 2007 (Civil Case No. 3:07-cv-533-HTW-LRA), also before this court. He filed a first amended complaint in that action on September 13, 2007.

On May 8, 2008, plaintiff filed an EEOC complaint regarding his January 2008 termination.  After receiving a right to sue letter from the EEOC he filed this civil lawsuit on December 23, 2008.  Defendant removed this case to federal court on March 4, 2009, within the 30-day window for removal after the February 23, 2009, date of service of process.  CT Corporation, Service of Process Transmittal, docket no. 1-2.

## II.  Legal Standard

### A.  Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

### B. Title VII Retaliation

To analyze a Title VII claim of retaliation, the court applies the *McDonnell Douglas* burden-shifting framework. *Rios v. Rossotti*, 252 F.3d 375, 380 (5th Cir. 2001). To prevail, plaintiff first must prove that: (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action; and (3) a causal connection exists between his engagement in protected activity and the materially adverse action. *Adams v. Groesbeck Indep. Sch. Dist.*, 475 F.3d 688 (5th Cir. 2007). When no direct evidence of retaliation is available, a plaintiff must establish causation by "circumstantial evidence creating a rebuttable presumption of retaliation." *Febela v. Socorro Indep. School Dist.*, 329 F.3d 409, 414-415. The burden of production then shifts to the employer to show a legitimate, non-discriminatory reason for the action. *Rios*, 252 F.3d at 380. If the defendant offers a legitimate reason for its actions, then the burden shifts to plaintiff to "adduce sufficient evidence that would permit a reasonable trier of fact to find that the proffered reason is a pretext for retaliation." *Id* (internal citation omitted). After this burden shifting process, should disputed issues of material fact remain, the lawsuit proceeds to trial with the plaintiff still obligated, as ever, to prove ultimately his contentions by a preponderance of the evidence. *Medley v. Dept. of Justice of Louisiana*, No. 10–31107, 2011 WL 1834817 at 3 (5th Cir. May 16, 2011).

### III.  Analysis: Title VII Retaliation

Plaintiff claims that defendant retaliated against him for his engaging in five protected acts: (1) providing a statement to the EEOC in June of 2002 in connection with the Conner race discrimination proceedings; (2) testifying at the Conner trial in

February of 2006; (3) filing his own charge of retaliation with the EEOC on November 1, 2006; (4) filing a lawsuit on July 24, 2007 (Civil Case No. 3:07cv533); and (5) filing an amended complaint in his first lawsuit (Civil Case No. 3:07cv533) on September 13, 2007.  Plaintiff suffered an adverse action by the defendant when he was terminated in January 2008.

The defendant argues that Nowell has failed to make a *prima facie* case for Title VII retaliation because he has provided no evidence of a causal link between his protected activities and his termination.  IC's arguments are two-fold, first that the decision-makers involved in Nowell's January 2008 firing were unaware of Nowell's Title VII protected activities, and the temporal proximity between his termination and his protected activities does not show a causal link.

### A.  Decision-Maker's Knowledge of Nowell's Protected Activity

"[I]n order to establish the causation prong of a retaliation claim, the employee should demonstrate that the employer knew about the employee's protected activity." *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 883 (5th Cir. 2003)(internal citations omitted).  This requires the plaintiff to "produce at least some evidence" showing knowledge on the part of the employer.  *Id* at n.6.  Specifically, plaintiff must show the decision-maker who took the adverse action was aware of the protected activity.  *See Ramirez v. Gonzalez*, 225 Fed.Appx. 203, 210 (5th Cir. 2007).  The burden of proof to demonstrate the *prima facie* element of "causal link" is not stringent.  The plaintiff merely needs to show "that the protected activity and the adverse employment action 'were not wholly unrelated'."  *Long v. Eastfield College*, 88 F.3d 300, 305 n.4 (5th Cir. 1996).

11

The plaintiff relies on *Long v. Easterfield College*, to say that knowledge of the protected activity may be imputed to the decision-maker.  The court may only impute this knowledge if the decision-maker is merely "rubber-stamping" the recommendation of another employee who is retaliating against the plaintiff.  *See Long*, 88 F.3d at 307.

In the *Long* case, two employees of Easterfield College, who had made past complaints against their respective supervisors for sex and race discrimination, were terminated by the college President for an incident involving losing and secretly replacing a Human Resources file room key.  The President reviewed written statements from all involved in the incident, including the employees' statements and their supervisors' recommendations for termination, prior to deciding to fire both employees.  The employees sued the college, with claims of a hostile work environment and retaliatory discharge, under Title VII.  The plaintiffs said that their supervisors recommended termination as retaliation for the employees' prior complaints of discrimination.  These retaliatory recommendations, said plaintiffs, established a causal link between plaintiffs' protected activities and their termination.  With respect to the causal link, the court stated:

> If Aguero [the college president] based his decisions on his own independent investigation, the causal link between Clark and Kelly's [the supervisors] allegedly retaliatory intent and Long and Reavis's [the employees] terminations would be broken.  If, on the other hand, Aguero did not conduct his own independent investigation, and instead merely "rubber stamped" the recommendations of Clark and Kelley, the causal link between Long and Reavis's protected activities and their subsequent terminations would remain intact.  88 F.3d at 307(internal citations omitted).

The Fifth Circuit reversed the district court's grant of summary judgment on plaintiffs' retaliation claim pointing to the fact that the district court focused solely on the college

12

President's intent, and did not consider whether he accepted the allegedly retaliatory recommendations or made his own findings.  *Id*.

Following are the individuals involved in Nowell's alcohol and drug testing, suspension, investigation and termination.  The parties who were either present or had contact with Nowell on the night of December 7th and morning of December 8th, 2007, were:  Crew Caller, Joan Sabo; Trainmaster, Joey Haynes; Assistant Superintendent, Joey Bellamy; Special Agent, Mark Moore; and the medical tester who administered the alcohol and drug tests, Robert Wilson of Acosta Medical Testing.  After Nowell's positive breath alcohol test, Senior Manager of Medical Services, Hallie Barhoe, removed plaintiff from service.  Special Agent, Wayne Barfield attempted to deliver notice at his home of the subsequent company investigation.  Trainmaster, J.R. Kyzar, conducted the company investigation, including hearings on December 18, 2007, and January 11, 2008.  Superintendent, Pat L. Owens signed Nowell's termination letter.

### 1) Direct Evidence of Knowledge

When asked in his deposition whether he had any reason to believe any of these individuals knew of his protected activities, or had mentioned any of these protected activities to him (Nowell), plaintiff replied, "Not as I remember," "I don't know," or "No." Nowell depo. at 96-104.  He asserts that the supervisors involved in his termination must have known about his Title VII protected activities, because those activities were "common knowledge".  Following is an excerpt from Nowell's September 9, 2009, deposition:

Q:    Do you have any reason to believe, Mr. Nowell, if Mr. Moore, Mark Moore, the claims representative who was at your testing on December 8th of 2007, do you have any reason to believe that Mr. Moore had any knowledge of your testimony

at the Joseph Conner trial?

A:    I mean, all you can do is know that you're–all you know, you know, what one official knows out there, they all know.

Q:    I'm not asking you to speculate. I'm asking do you have any reason to believe if Mr. Moore had any knowledge of your testimony of the trial of Joseph Conner in February 2006?

A:    Are you asking me does he know what the outcome–did he know what the outcome or did he know that I testified at that trial?

Q:    I'm asking do you have any--

A:    It was common knowledge out there on that railroad that I testified.  Everybody knew."  Nowell depo. at 101.

A further excerpt from Nowell's deposition transcript is instructive:

Q:    Other than Mr. King, who you're not sure whether he knows or not, who do you believe at IC is aware of that EEOC charge of yours?

A:    I believe that L.W. King, Wayne King. I believe Joey Bellamy. I believe Pat Owens. I believe Tom Evans is aware of it. And I also believe–I'm trying to think of the human resources lady's name that was there. I can't remember her name. But like I said, I believe they have.

Q:    You believe? You don't know?

A:    Right, I don't know.

Q:    Okay. And we've already talked about the fact that none of these people, Bellamy, Owens, Tom Evans or the HR lady ever had any conversation with you?

A:    No.

Q:    In connection with your January 18th, 2008, termination that relates to that charge; is that right?

A:    Right.

Plaintiff's own sworn deposition testimony, says defendant, indicates that plaintiff

has no evidence whatsoever that anyone involved in plaintiff's termination was aware of

his protected activities.  *See Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d

164 168 (5th Cir. 1999) ("If an employer is unaware of an employee's protected conduct

. . . employer plainly could not have retaliated against the employee based on that

conduct").

Plaintiff also acknowledged in his deposition that he had no reason to believe

Tom Evans, the Assistant Superintendent who fired him in October 2006, participated in

14

his January 2008 termination or was even working in the area at the time.  Following is

an excerpt from Nowell's September 10, 2009, deposition:

Q:     How do you link your testimony that day or that month [February 2006 testimony
       in Conner lawsuit] to your January 18, 2008?
A:     Because Tom Evans told me he was going to get me for what I done to the
       railroad.
Q:     Did Tom Evans have anything to do with your January 18th, 2008, termination?
A:     No, ma'am.
Q:     Do you know if Tom Evans was even working in Jackson, Mississippi as of
       January 18th, 2008?
A:     No . . .
       Nowell depo. at 93-94.

        Beyond plaintiff's failing to show anyone involved in his alcohol and drug testing

knew about his protected activities, defendant contends that plaintiff does not identify

*any* IC employee whom he claims is responsible for his termination.  Defendant

contends that plaintiff's failure to identify a decision-maker with respect to his

termination, or to present any evidence that the unnamed decision-maker was aware of

this protected conduct or acted with any retaliatory animus, requires dismissal of his

retaliation claim.

        Although plaintiff fails to explicitly identify Owens as such, this court is satisfied

that Pat Owens was the decision-maker who terminated Nowell.  Owens was the IC

Superintendent for the Jackson Area at the time of Nowell's termination, and signed

Nowell's termination letter.  Nowell has provided no evidence that Owens was aware of

Nowell's participation in the Conner complaint and lawsuit, or his own prior lawsuit

against IC and CN.  Defendant argues that even if Bellamy, Moore, Kyzar and others

involved in Nowell's alcohol testing and subsequent investigation knew about Nowell's

protected activity, Owens' independent termination of Nowell, would "sever [. . . ] the

causal link between" the termination and the retaliatory animus.  *Long*, 88 F.3d at 306.

Following are excerpts from Nowell's deposition related to Owens' knowledge about his

protected activity:

Q:    Mr. Owens, did Pat Owens, superintendent, ever talk to you about the Conner
      trial?
A:    Not as I remember.
Q:    Did he ever talk to you about any EEOC charges you may have filed against the
      company?
A:    Not as I remember.
      Nowell depo. at 103.

A:    32 [exhibit no. 32] is the termination letter?  That's signed by Pat Owens.  Okay.
      . . .
Q:    So is your answer to Interrogatory No. 10, "Identify who retaliated against you as
      alleged in your complaint."  Is your answer Pat Owens?
A:    I would have to get with my counsel on that. . . .
Q:    Well, I need your–only you know, Mr. Nowell, who you believe retaliated against
      you.
      Nowell depo. at 195-96.

During this exchange, plaintiff never stated that Pat Owens had retaliated against him in

his termination.

With respect to imputing knowledge to the decision-maker, defendant correctly

argues that *Long* provides plaintiff no support.  *Long* is distinguishable because the

plaintiffs in that case created a material question of fact, as to the causal link

requirement for retaliation, by offering evidence that they had complained about being

harassed and discriminated against by their immediate supervisors, that these

supervisors were aware of their complaints, and those same supervisors recommended

that the college President terminate the plaintiffs.  In this case, Nowell has neither

identified record evidence, nor alleged any facts which indicate any of the supervisors

involved in his alcohol testing or subsequent investigation knew about his protected

activities.  Thus, Nowell has neither offered evidence that Owens knew about Nowell's protected activities, nor provided evidence that anyone else had such knowledge that, under the evidence, could be imputed to Owens.

Plaintiff employs circular reasoning to show a causal link between his protected activity and his January 2008 termination.  He claims he was an exemplary employee before testifying in the Conner case.  After testifying, he claims he was treated differently and started accumulating reprimands and negative comments in his personnel file.  He argues that he was terminated because of the company's vendetta against him for participating in the Conner EEOC complaint and lawsuit.  The proof of that vendetta, according to plaintiff, is his termination.

### 2) Indirect Evidence of Knowledge

With respect to the events of December 7th and 8th, Nowell claims that IC employees and the testing technician did not adequately follow the procedures required in federal regulations and the CN/IC policy handbook.  These irregularities, he argues, demonstrate that they were pursuing a vendetta against him and the entire incident was orchestrated to destroy his career.  Nowell, however, brings forth no evidence to cast into doubt the alcohol breath test results which showed he reported to duty under the influence of alcohol on the morning of December 8, 2008.

Nowell complains that the supervisors who ordered the drug test did not observe him long enough to form the "reasonable suspicion" necessary to require the alcohol and drug test; that the testing technician overlooked the necessary step of obtaining his written consent before administering the first alcohol breath test; and no one offered him a waiver and opportunity to participate in an employee assistance program before

17

the company investigation which led to his termination.

### a. Reasonable Suspicion Testing

The CN Drug and Alcohol Rules and Regulations Policy Handbook ("Policy

Handbook") dated January 2005 states the following:

4.5 Reasonable Suspicion Testing

All CN employees are subject to reasonable suspicion testing.  This may include a drug
screen and/or breath alcohol test.
 . . .
B.    With respect to a breath alcohol test, the required observations must be made by
one (1) trained supervisor.  The test must not be conducted by the supervisor
who makes the observation.
C.    If suspicion is confirmed by these observations, a test <u>must</u> be conducted.
Covered service employees <u>must</u> be tested under DOT authority.  All other
employees must be tested using company authority.

This section of the Policy Handbook comports with federal regulation, Title 29

C.F.R. § 219.300, which requires railroads to conduct mandatory alcohol testing when

"reasonable suspicion" exists.  *See* Title 29 C.F.R. § 219.300(a)(1).  Reasonable

suspicion under the statute "must be based on specific, contemporaneous, articulable

observations concerning the appearance, behavior, speech or body odors of the

employee."  *Id*.

Around 7:30 p.m. on December 7, 2007, Nowell called the Trainmaster Joey

Haynes asking him to "mark him off" for personal business because his son was sick.

Nowell was scheduled to report to work at 2:45 a.m. on December 8, 2007.  Haynes

told Nowell he did not have the authority to grant him leave for "personal business", but

told him to take off sick.  Nowell refused, saying his son was sick, not he.  Haynes

referred him to Joey Bellamy, the Assistant Superintendent, to get permission to take

off for personal business and gave him Bellamy's office number.  Nowell called

18

Bellamy's office, but did not leave a message.  Nowell also called Joan Sabo, the Crew Caller, asking to "mark off" for personal business.  Sabo told Nowell she was not authorized to let him "mark off," but connected Joey Haynes to the call.  Haynes again told Nowell he would have to speak with Joey Bellamy for permission to "mark off" for personal business.  Nowell told them he would report to work.  After Nowell hung up, Sabo commented to Haynes that Nowell was drunk and should be tested.

Haynes contacted Bellamy and apprised him of the situation.  Haynes recommended Bellamy review the recording of the phone conversation because of concerns that Nowell was impaired.  Bellamy went to the office and obtained a copy of the voice recording.  According to Bellamy, Nowell was slurring his speech on the recording.  Bellamy called in a medical technician from Acosta Medical to be available to drug and alcohol test Nowell when Nowell arrived at work.  He also called in Special Agent, Mark Moore, of CN's Risk Management Department.

Nowell arrived at work at approximately 2:38 a.m.  Haynes, Bellamy and Moore met him in the parking lot.  Their accounts differ slightly, but Nowell claims that as soon as he stepped out of his car, he was informed by Moore he would have to take alcohol and drug tests because he was under "reasonable suspicion" of being impaired. Bellamy and Moore both testified in the CN investigation that they spoke with Nowell for three or four minutes before telling him he would have to take alcohol and drug tests. They claim he was trembling and shaky, his eyes were red and bloodshot, and he smelled like "he had bathed in mouthwash."

Nowell claims that "reasonable suspicion" requires face-to-face observation and they cannot require a drug or alcohol test based on the recording of his phone

conversation with Sabo and Haynes.  Their decision to test him, he alleges, was not based on reasonable suspicion, but before he ever arrived that evening, they decided to test him in retaliation for his involvement in Conner's trial and his own EEOC complaint and law suit.

Bellamy and Moore testified in the CN company investigation that the phone call would not have been sufficient by itself, but put them on notice that they might have a problem which would require immediate action to protect the safety of other employees. Bellamy stated he called Acosta Medical Testing to have someone available should testing be necessary.  Upon confronting Nowell when he arrived at work, Bellamy and Moore determined that Nowell was impaired from his demeanor, speech, and smell. Finally, the breath alcohol test confirmed their suspicions, that he had alcohol present in his system and could not safely work as a brakeman.

### b.  Written Consent for Alcohol Testing

The Department of Transportation Alcohol Testing Form lays out a four step process for a breath alcohol test.  In step one the technician reviews the employee's identification and fills out the personal information on the drug testing form.  In step two the employee signs the form, showing consent for the test.  The third step is conducting the breath test and recording the results.  If the result in step three is positive for alcohol, the tester waits fifteen minutes then conducts a confirmation test.  Step four is signed by the employee after the confirmation test.[11]  *See* Nowell depo. at 44-51; *see*

---

[11]  The alcohol testing form is provided in the record. The details regarding each step have also been gleaned from Nowell's September 9, 2009, deposition testimony and Wilson's October 2, 2009, deposition.

20

Wilson depo. at 22-29.

On the morning of December 8, 2007, Wilson completed step one, but failed to have Nowell sign the consent statement in step two. Wilson proceeded directly to step three, in which Nowell blew into the breath analyzer. The first test yielded a result of 0.043, which exceeds both the Department of Transportation and CN limits for breath alcohol levels.[12]  Wilson informed Nowell he would have to wait fifteen minutes to perform a confirmation test. Nowell could not wait and asked to go to the bathroom. Nowell went to the bathroom and took a bottle of water, which he drank in the bathroom. When one of the supervisors told Wilson that Nowell was drinking a bottle of water in the bathroom, Wilson asked him to return to the testing area and wait for the confirmation test.

Wilson cleared the breath analyzer and Nowell took the second breath alcohol test, which yielded a result of 0.037 breath alcohol level. Wilson recorded the results of the confirmation tests and realized he had failed to get Nowell to sign step two. Wilson asked Nowell to sign both steps two and four, but Nowell refused. Nowell stated Wilson had not followed the proper testing procedure because he did not have Nowell sign step two before administering the first breath test. He maintains that he did not refuse to the take the test (refusal to take the breath test would result in discipline, up to and including termination), but that the testing was invalid because Wilson did not take the steps in the right order.

---

[12] Policy Handbook Section 6.3 states that a breath alcohol test result equal or greater than 0.02% is a violation of CN policy. This section of CN's Policy Handbook states that "breath alcohol concentrations greater than or equal to 0.04% are also in violation of federal statutes for safety-sensitive employees, provided federal authority forms are used."

21

The federal regulations governing procedures for transportation workplace drug and alcohol testing cite specific instances or "fatal flaws" when a drug or alcohol test must be cancelled.  Title 49 C.F.R. § 40.267.  These "fatal flaws" include using expired testing equipment or supplies, using a "breath tube ASD" which "is tested with an analyzer which has not been pre-calibrated for that device's specific lot," not waiting the requisite fifteen minutes before conducting the confirmation test, etc.  The issue Nowell has raised regarding Wilson's failure to follow the proper steps is not a "fatal flaw" as defined by the federal regulation.  Further, Nowell does not claim that his refusal to sign the form constituted a lack of consent to submit to testing for alcohol or drugs.

### c.  Waiver and the Employee Assistance Program

Nowell claims that the Policy Handbook requires the company to offer him a waiver from investigation and referral to an employee assistance program instead of termination.  Section 7.6 addresses waivers and states:

> Available for first time drug and alcohol violations only.  Upon written notification of the investigation, the employee will also be offered, in writing, a waiver of the formal investigation required under collective bargaining agreements.  The employee may exercise the waiver at any time prior to the investigation date specified in the written notification. When the employee elects to complete and sign the waiver, the employee is admitting to the violation.  The violation will be recorded in the employee's personal record.

A separate section of the Policy Handbook, Section 8, states in pertinent part:

> 8.2   All employees having a first time violation of this policy will be referred to an EAP Manager, either by the employee's supervisor or the Medical Services Department.
>
> 8.3   The EAP Manager will provide the employee with Substance Abuse Professional (SAP) contact information.  Employee must schedule and complete an initial, face-to-face evaluation by a SAP within ten (10) days of receiving this information from the EAP Manager. Employee will pay expenses such as travel and SAP fees not

22

covered by the employee's insurance plans.  Failure to complete the initial face-to-face SAP evaluation may subject the employee to dismissal for failure to follow instructions.

Federal regulation, Title 49 C.F.R. § 40.285, states:

"a DOT alcohol test with a result indicating an alcohol concentration of 0.04 or greater . . . constitutes a DOT drug and alcohol regulation violation." Title 49 C.F.R. § 40.285(b)  An employee who violates this regulation "cannot again perform any DOT safety-sensitive duties for an employer until and unless [he] complete[s] the SAP evaluation, referral, and education/ treatment process [. . .]."

Nowell has pointed to no policy or regulation which states that the waiver and participation in the EAP will guarantee he can keep his job.  The Policy Handbook specifically states that "[e]mployees who test positive for alcohol . . . will be subject to discipline up to and including dismissal."  Policy Handbook, Section 3.1(C)(2). Discipline is decided by "[c]onsideration of the events surrounding the incident and the employee's personal record" to determine "the actual length of discipline up to and including dismissal."  Policy Handbook, Section 3.1(D)(2).

Finally, plaintiff was given a referral to an SAP.  He indicated in his deposition that he was given a phone number and called an SAP.  He does not elaborate on what happened after that referral.  He complains that Hallie Burhoe gave him the phone number of an SAP, "but it was not an appointment date, or anything like that."  Nowell depo. at 75.  Nowell apparently spoke with an SAP, but his deposition does not indicate if he had an appointment or followed-up in any way.  *See* Nowell depo. at 75-78.

Nowell argues that his supervisors did not observe him sufficiently to form reasonable suspicion for testing and that the tester failed to have him sign the testing form in the right order.  He does not claim, however, that he refused to be tested or

offer evidence that the positive alcohol test was invalid.  Further, plaintiff seems to complain that the EAP Manager did not make an appointment for him to meet with a SAP; however, he received a referral and contacted the SAP himself.  Defendant's procedural approach was legally sufficient.

Nowell has failed to provide evidence that any of the supervisors involved in his alcohol testing knew about his Title VII protected activities, or held any retaliatory animus toward him when they subjected him to the testing or proceeded to an investigation.

### B. Temporal Proximity of Termination to Protected Activity

Plaintiff argues that his last protected activity, amending his complaint in Civil Action No. 3:07cv533, occurred only four months before his January 2008 termination. The close proximity in time between this protected activity and his termination demonstrates, he says, that his firing was in retaliation for his lawsuit and other protected activities.

Defendant challenges plaintiff's temporal proximity argument by citing the amount of time that elapsed between his initial protected activities and his discharge. Five and a half years intervened between plaintiff's first affidavit in the Conner EEOC investigation, on June 30, 2002, and plaintiff's final discharge in January of 2008. Plaintiff's testimony in the Conner discrimination trial occurred approximately two years prior to plaintiff's last termination.  Defendant argues that too much time elapsed to establish a sufficiently close temporal proximity to support an inference of causation.

Temporal proximity is one factor courts consider to determine if a causal link exists between a plaintiff's protected activity and an adverse employment action, but is

not determinative of retaliation.  *See DeHart v. Baker Hughes Oilfield Operations*, 214 Fed. Appx. 437, 442 (5th Cir. 2007).  This court has considered the temporal proximity between each of the various activities in which Nowell engaged, starting with his initial affidavit in the Conner EEOC investigation, up to filing of his Amended Complaint in Civil Action No. 3:07-cv-533 on September 13, 2007.  Review of these activities and their relationship in time to his third and final termination does not change this court's findings.  Plaintiff has failed to make a showing that any supervisor involved in his termination knew about his Title VII protected activity.  Plaintiff, therefore, has not created an issue of material fact as to the causal link between his protected activity and termination, and cannot show a *prima facie* case for retaliation.

### IV.  Conclusion

Plaintiff concedes his intentional infliction of emotional distress claim but does not concede his punitive damages claim.  Plaintiff has failed to provide evidence of a *prima facie* case of retaliation, specifically evidence of a causal link between his protected activities and his termination.  Without a substantive claim, punitive damages cannot be awarded in this case.  For the foregoing reasons, this court grants defendant's motion for summary judgment as to all claims.  The court will enter a final judgment in accordance with the local rules.

SO ORDERED, this the 17th day of August, 2011.

s/ HENRY T. WINGATE
UNITED STATES DISTRICT JUDGE


Civil Action No. 3:09-cv-131 HTW-LRA
Memorandum Opinion and Order Granting Summary Judgment